# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:13-cr-00125-APG-GWF |
| | ) | |
| vs. | ) | **FINDINGS & RECOMMENDATIONS** |
| | ) | |
| JACERE CENTERS, | ) | **RE: Motion to Suppress (#22)** |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter is before the Court on Defendant Jacere Centers' Motion to Suppress Physical Evidence and Statements Due to an Impermissible Search and Seizure (#22), filed on July 29, 2013. The Government filed its Response to Defendant's Motion (#24) on August 15, 2013. Defendant filed his Reply (#27) on August 20, 2013. The Court conducted an evidentiary hearing in this matter on August 27 and November 12, 2013.

## FACTUAL BACKGROUND

The indictment in this case charges Defendant Jacere Centers with possession of a firearm by a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).[1] Defendant's motion to suppress concerns the stop of the automobile he was driving on March 6, 2013 and the police officers' subsequent decision to impound the automobile and conduct an inventory search of it. During the inventory search, the officers found a Sig Sauer .45 caliber handgun in a covered space behind the steering column. After being advised of his *Miranda* rights, Defendant admitted that the handgun was his and that he kept it in the automobile for protection.

---

[1] Defendant was convicted in 2008 for the felony crime of discharging a firearm into a structure, aircraft or watercraft.

1    The March 6, 2013 automobile stop arose out of a Las Vegas Metropolitan Police

2    Department (LVMPD) investigation of an incident that occurred at the Palms Hotel and Casino on

3    January 13, 2013.  The Palms security department reported that a group of males and females were

4    observed smoking marijuana in the casino food court.  A security officer was directed to tell the

5    group that they could not smoke marijuana inside the casino and to ask them to leave.  Palms

6    personnel manning surveillance cameras observed members of the group produce firearms when

7    they saw the security officer approaching.  The security officers were instructed to "back off" from

8    the group.  The group then exited the casino and entered the parking garage where some of the

9    individuals entered two vehicles and left the area.

10   Detective Benjamin Rose of the LVMPD Tourist Crimes Unit went to the Palms on January

11   19, 2013 to investigate the incident.  He viewed the surveillance video which showed two males,

12   and possibly a third, in possession of a semi-automatic handgun and a dark colored revolver.

13   Detective Rose determined that one of the vehicles observed on the video was registered to Laron

14   Payne who was later identified as one of the males who displayed a handgun during the incident at

15   the Palms.  Police officers took Laron Payne into custody on January 24, 2013.  Mr. Payne was

16   shown "surveillance stills" from the Palms and identified three of individuals shown in the video

17   by their nicknames "Ant-Locc," "J-Wood," and "Big Bahoo."   Mr. Payne stated that these

18   individuals were associated with a street gang known as "Wood."

19   Detective Rose thereafter contacted LVMPD's Gang Unit to identify the members of the

20   group seen on the Palms surveillance video.  Gang Unit detectives identified Defendant Jacere

21   Centers, whom Mr. Payne referred as "J-Wood," as one of the individuals seen in the surveillance

22   video holding a handgun.  Gang Unit detectives identified Gary Hooks as another individual seen

23   holding a handgun.  Detective Rose placed a notification in the LVMPD patrol briefing line

24   detailing the crimes that Defendant Centers and Gary Hooks were suspected of and asking any

25   officer to contact Detective Rose if either individual was encountered.

26   On March 6, 2013, Detective Rose and other detectives with the Tourist Crimes Unit

27   conducted surveillance at an apartment complex located in the vicinity of Lake Mead Boulevard

28   and Nellis Boulevard in Las Vegas, Nevada where Defendant Centers was believed to be located.

1   Detectives observed Defendant Centers and a female enter an automobile and leave the apartment

2   complex.  Although Detective Rose testified that probable cause existed to arrest Defendant

3   Centers based on the January 13, 2013 incident at the Palms, the detectives decided to have a

4   uniformed LVMPD officer in a marked patrol vehicle stop Centers' automobile for a traffic

5   violation which the detectives anticipated would occur.  Detective Rose testified that the officers

6   decided to conduct the stop in this manner for two reasons:  First, it is safer to have a uniformed

7   officer in a marked patrol car make the stop so that the driver is aware that the police are attempting

8   to stop his vehicle.  Second, if it turned out the officers were mistaken in the belief that Defendant

9   Centers was in the vehicle, the actual reason for the stop would not be revealed to the vehicle

10  occupants and somehow transmitted back to the Defendant.

11        Officer Michael O'Halloran testified that he was working as a patrol officer in the vicinity

12  of Lake Mead Boulevard and Nellis Boulevard on March 6, 2013 at approximately 6:00 p.m.

13  Detective Ramone Nakhla contacted Officer O'Halloran while he was performing an unrelated

14  traffic stop.  Detective Nakhla told Officer O'Halloran that the detectives were working on a case

15  that had occurred near the Las Vegas Strip and were conducting surveillance on a suspect.

16  Detective Nakhla asked Officer O'Halloran to assist in stopping the suspect's vehicle.  The

17  detective did not inform Officer O'Halloran of the details of the investigation, but Officer

18  O'Halloran believed it involved a violent crime or felony.  Officer O'Halloran testified that

19  Detective Nakhla may have also showed him a picture of Defendant Centers and informed him that

20  Defendant was a gang member.

21        Officer O'Halloran testified that he and Detective Nakhla waited in his patrol vehicle for

22  several minutes until a description of the vehicle in which Defendant was believed to be riding was

23  broadcast over the police radio.  Officer O'Halloran then observed the vehicle and began to follow

24  it on Lake Mead Boulevard.  Officer O'Halloran testified that the automobile crossed over the left

25  lane line, thereby failing to maintain its lane of travel.  Officer O'Halloran signaled the automobile

26  to stop and the driver pulled over to the side of Lake Mead Boulevard.  The driver produced a

27  driver's license or identity card that identified him as Jacere Centers.  Officer O'Halloran had the

28  Defendant exit the automobile and placed him in custody based on the detectives' statements that

1   they had probable cause to arrest him for the crime they were investigating.  Officer O'Halloran
2   subsequently transported Defendant to jail.  Defendant was not cited for the alleged traffic
3   violation.

4         Detective Rose testified that the vehicle was stopped on Lake Mead Boulevard at
5   approximately 6:30 p.m.  He stated that traffic was busy on the street and that he and the other
6   detectives arrived on the scene shortly after the stop occurred.  Detective Rose testified that neither
7   Defendant Centers nor the female passenger, Chaquaya Moore, was the registered owner of the
8   automobile.  The registered owner was identified as Jacquioa Gray.  Detective Rose testified that
9   either he or Sergeant Connell spoke with the registered owner by telephone.  Initially, Detective
10  Rose testified that he or Sergeant Connell spoke to the registered owner on his cell phone.  On
11  cross-examination, however, Detective Rose stated that he or Sergeant Connell spoke to Ms. Gray
12  on Chaquaya Moore's cell phone.  He indicated that Ms. Moore had either called Ms. Gray or had
13  been called by Ms. Gray.  Detective Rose testified that Ms. Gray told him or his sergeant that she
14  could not come down to the scene and that she wanted the police to release the car to Ms. Moore.
15  Detective Rose testified that he informed Ms. Gray that the police would not release the vehicle to a
16  person who was not a family member or the registered owner of the vehicle.  Detective Rose stated
17  that he told Ms. Gray the name of the tow company that would take the vehicle.  According to
18  Detective Rose, Ms. Gray stated that she did not have any way "to get down there."  Detective Rose
19  testified that he inquired where Ms. Gray was located to see if it was possible for the police to pick
20  her up so that she could retrieve the vehicle.  According to Detective Rose, Ms. Gray did not want
21  to tell the police her location.

22        The arrest report prepared by Detective Rose does not set forth any information about the
23  decision to impound the vehicle or the detectives' alleged communications with the registered
24  owner.  Detective Rose testified that he did not believe it was necessary to include this information
25  in his report.  Officer O'Halloran testified that he was aware that an inventory search of the
26  automobile was conducted, but he did not personally observe the search.  He also testified that he
27  "heard" that officers attempted to make contact with the registered owner of the vehicle, but he was
28  not personally aware of any communication with the registered owner.

4

1    Detective Rose testified that Detective Jeff Kinsler performed an inventory search of the

2    vehicle.  Detective Rose stated that he left the scene before the inventory search was conducted.

3    While enroute to police headquarters, he received a call from Detective Kinsler who told him that a

4    handgun had been found in the vehicle.  Detective Rose thereupon returned to the scene and

5    Detective Kinsler showed him where the handgun was located.

6    Detective Jeff Kinsler testified that he was in the group of detectives who conducted

7    surveillance at the apartment complex on March 6, 2013.  Detective Kinsler observed Defendant

8    Centers and a female enter an automobile.  Detective Wofford, who was with Detective Kinsler,

9    notified the other detectives by radio or phone that Defendant was leaving the apartment complex

10   and gave a description of the automobile.  Detective Kinsler followed the Defendant's automobile,

11   while Detective Wofford provided information to the other officers over the radio or phone as to

12   the direction of the vehicle.  Detective Kinsler went to the scene of the traffic stop.  He was

13   informed that the automobile was going to be impounded and he was instructed to perform an

14   inventory search.  Detective Kinsler assumed that Detective Rose directed that the automobile be

15   impounded.  Detective Kinsler was informed that the registered owner of the vehicle had been

16   contacted, but he was not personally involved in that communication.

17   Detective Kinsler testified that he has received training in how to conduct an inventory

18   search of an automobile, including looking for concealed compartments.  Detective Kinsler

19   testified that he divides the vehicle into quadrants.  He thoroughly searches the vehicle so as not to

20   miss anything.  Detective Kinsler testified that he began his search in the driver's area of the

21   vehicle.  He shined his flashlight into a gap in the paneling behind and/or below the steering wheel

22   and saw the trigger and trigger guard of a firearm.  Detective Kinsler testified that he commonly

23   searches this area when conducting an inventory search and has found items in this area on at least

24   five or more occasions.  Detective Kinsler called Detective Nakhla to observe what he had seen and

25   Detective Nakhla reached into the area and retrieved the firearm.  Detective Kinsler took

26   photographs of the area where the handgun was found.  After the discovery of the firearm,

27   Detective Kinsler completed the remainder of the inventory search.  He called for the tow truck at

28   6:42 p.m. which was approximately 22 minutes after the automobile was stopped.

The defense called Jaquoia Gray as a witness at the evidentiary hearing. Ms. Gray testified that Defendant Center is her boyfriend and the father of one of her children. Ms. Gray testified that she and Defendant Centers are still in a relationship and that she does not want anything bad to happen to him. Ms. Gray stated that she is the owner of the automobile that Defendant Centers was driving on March 6, 2013 and he had her permission to drive it. Mr. Centers was supposed to pick her up from work at 6:00 p.m. that day. Ms. Gray received a telephone call from Defendant Centers who informed her that he had been pulled over by the police at Lake Mead Boulevard and Walnut Street. He also told her that the automobile would be towed. Ms. Gray asked Defendant if there was anyway for her to pick up the automobile. Defendant told her that he had spoken with his brother and "they" were on the way to see if they could get the car. Ms. Gray testified that she was at work when she received the call. She testified that she did not receive any call from the police or speak with any police officers on March 6, 2013. Ms. Gray testified that she does not know a person named Chaquaya Moore and she was not aware that there was a female passenger in the automobile at the time it was stopped by the police.

Following the August 27, 2013 evidentiary hearing, the Government provided Defendant's counsel with the telephone call records for Detective Rose's cellular telephone on March 6, 2013. The parties have stipulated that Detective Rose's cell phone did not have any incoming or outgoing calls for the period between 6:00 p.m. and 8:40 p.m. *See Joint Status Report (#37).* Detective Rose's cellular phone records were admitted into evidence as Defendant's Exhibit H.

Jacquioa Gray again testified in this matter on November 12, 2013. A copy of her cellular phone records for the period March 1 through March 7, 2013 was admitted into evidence as Exhibit J. Ms. Gray also prepared a written (email) list that identifies the phone numbers that she called and which called her cellphone on March 6, 2013 which was admitted into evidence as Exhibit I. Ms. Gray testified that she received a telephone call from the Defendant at 6:33 p.m. at which time he told her that he had been stopped and that the vehicle would be towed. She thereafter spoke with relatives and friends in an attempt to have someone pick her up, take her to the scene of the stop, or go to the scene to attempt to retrieve the automobile. She did not speak with any police officers. Later that evening Ms. Gray telephoned the Las Vegas Metropolitan Police Department,

1  the North Las Vegas Police Department and three tow companies, including Fast Towing, the

2  company that towed her vehicle, but was unable to obtain information about her vehicle.  Ms. Gray

3  testified that when she subsequently obtained her vehicle, it had sustained damage where panels or

4  other parts in the interior had been pried open.

5       The LVMPD policy manual sets forth policies and procedures for inventory searches.  It

6  states as follows:

7          Inventories -- An inventory is not a search for evidence of crime, but
           is justified to protect an owner's property while it is in the custody of
8          the police, to ensure against claims of lost or stolen property, and to
           guard the police from danger.
9
           When a vehicle is lawfully impounded (See 5/202.20 and 5/204.06),
10         an officer shall conduct an inventory search of that vehicle and
           containers found therein and report all personal property on the
11         LVMPD 503, Vehicle Impound Report.  If the inventory is part of a
           vehicle seizure (See 5/105.14), the personal property will be
12         impounded and placed in the evidence vault.

13         Impound/inventory involves two levels of decision making and
           action by the officer.  There is the impoundment of the vehicle and
14         the inventory search itself.  Both of these two actions must be done
           pursuant to standardized criteria which limits the discretion of the
15         officer and ensures that impound/inventory are legally performed and
           not a guise for a general exploratory search.  In an inventory, all
16         containers and their contents within a vehicle must be documented
           for the above stated policy reasons.
17

18  *Defendant's Exhibit C, pg. 442.*

19       Section 5/202.20 of the policy manual deals with the disposition of an arrested person's

20  vehicle.  It states in pertinent part as follows:

21         The arresting officer has the option of allowing the arrestee, provided
           they are the registered owner, to leave his vehicle parked or have it
22         towed if the following conditions exist:

23             1.    The arrestee is 18 years or older.
               2.    The arrestee is not under the influence of intoxicating
24                   liquors or drugs.
               3.    The vehicle is parked legally on the roadway or
25                   private property open to the public.
               4.    The vehicle is not needed for evidence.
26
           If the arrestee is not the registered owner, the officer will attempt to
27         notify the registered owner that the vehicle in question will be towed
           if they do not come to the scene and take custody of their vehicle.
28

7

1    The registered owner would be advised they need to respond in a
2    timely manner (generally 30 minutes.)

3    *Defendant's Exhibit C, pg. 476.*

4    Section 5/204.06 of the policy manual also deals with vehicle impounds.  It states:

5    It is the policy of this department that to impound a vehicle without
     cause is strictly forbidden.
6
     IMPOUNDING MOTOR VEHICLES
7    Vehicles may only be impounded in the following circumstances.
     Whenever a vehicle is towed under the listed circumstances; a
8    Vehicle Impound Report (LVMPD 503) will be completed.

9    *Defendant's Exhibit C, pg. 491.*

10   Section 5/204.06 lists 12 circumstances in which a vehicle may be impounded, including

11   the following:

12        1.    Whenever a driver is arrested and is (sic) no physical or
                mental condition to turn the vehicle over to the custody and
13              care of a relative or friend.  (See 5/202.20)  Such
                circumstances will be explained (sic) the Vehicle Impound
14              Report or the Arrest Report.

15   *Id., pgs. 491-492.*

16   Neither the Vehicle Impound Report, Exhibit E, nor the Arrest Report explained the

17   circumstances for the impound.

18                                  **<u>DISCUSSION</u>**

19   The Fourth Amendment to the United States Constitution provides that "[t]he right of the

20   people to be secure in their persons, houses, papers and effects, against unreasonable searches and

21   seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by

22   Oath or affirmation, and particularly describing the place to be searched and the persons or things

23   to be seized."  "Because warrantless searches and seizures are *per se* unreasonable, the government

24   bears the burden of showing that a warrantless search and seizure falls within an exception to the

25   Fourth Amendment's warrant requirement."  *United States v. Cervantes*, 703 F.3d 1135, 1141 (9th

26   Cir. 2012).

27   . . .

28   . . .

8

1.      __Whether the Automobile Stop Violated the Fourth Amendment.__

An investigatory stop of an automobile implicates the Fourth Amendment "'because stopping an automobile and detaining its occupants constitute a seizure . . . even though the purpose of the stop is limited and the resulting detention quite brief.'" *United States v. Choudhry*, 461 F.3d 1097, 1100 (9th Cir. 2006), quoting *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391 (1979). Investigatory traffic stops are akin to on-the-street encounters addressed in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868 (1968). Accordingly, a police officer may conduct an investigatory traffic stop if he has reasonable suspicion that a particular person has committed, is committing or is about to commit a crime. *Choudhry*, 461 F.3d at 1100, citing *United States v. Lopez-Soto*, 205 F.3d 1101, 1104 (9th Cir. 2000). A traffic violation alone is sufficient to establish reasonable suspicion or probable cause. *Id.*, citing *Wren v. United States*, 517 U.S. 806, 810, 116 S.Ct. 1769, 1772 (1996).

Defendant argues that the stop of his automobile violated the Fourth Amendment because Officer O'Halloran did not have probable cause or reasonable suspicion to believe that Defendant had violated a Nevada traffic law by crossing over the travel lane line on one occasion.

Nevada Revised Statute (NRS) § 484B.223.1, formerly NRS § 484.305.1, provides as follows:

> 1. If a highway has two or more clearly marked lanes for traffic traveling in the same direction, vehicles must:
>
> (a) Be driven as nearly as practicable entirely within a single lane; and
>
> (b) Not be moved from that lane until the driver has given the appropriate turn signal and ascertained that such movement can be made with safety.

Defendant cites this Court to *United States v. Delgado-Hernandez*, 282 Fed.Appx. 493, 2008 WL 2485429 (C.A.9 Nev.), in which the undersigned issued a report and recommendation which found that a driver did not violate this statute when the driver side tires of his vehicle momentarily crossed over the left fog line while traveling on Interstate Highway 15. The district judge disagreed and held that the driver violated the statute, which provided probable cause for the stop. In an unpublished opinion, the Ninth Circuit reversed and held that the driver's conduct in

1   momentarily crossing the lane line did not violate the statute. *See also United States v. Lopez-Rojo*,

2   2008 WL 2277495 (D.Nev. 2008) (analyzing the same statute, but finding that the officer had

3   probable cause to stop the vehicle based on different factual circumstances).

4       Even assuming that Officer O'Halloran did not have probable cause or reasonable suspicion

5   to stop Defendant's automobile for a violation of NRS § 484B.223.1, the stop did not violate the

6   Fourth Amendment.  Detective Rose and the other detectives on his Tourist Crimes Unit

7   investigative team had probable cause to arrest Defendant Centers for possession of a firearm by a

8   convicted felon in violation of NRS § 202.360, based on their collective knowledge that (1)

9   Defendant was a convicted felon and (2) the video evidence that showed Defendant brandishing a

10   handgun at the Palms Hotel and Casino on January 13, 2013.

11       The facts of this case are similar to those in *United States v. Ramirez*, 473 F.3d 1026 (9th

12   Cir. 2007).  In *Ramirez*, police officers discovered that a Mercury Mountaineer vehicle had a

13   concealed compartment that had been used to transport narcotics.  During subsequent police

14   surveillance, the officers observed what appeared to be a narcotics transaction during which a gym

15   bag was loaded into the rear of the Mercury Mountaineer where the concealed compartment was

16   located.  The sergeant in charge of the surveillance team issued a request over the police radio that

17   a uniformed officer make a "traffic stop" of the vehicle.  Officer Hublen responded to the request

18   and stopped the vehicle for straddling two lanes of traffic with both passenger side tires.  The

19   defendants conceded that the police officers involved in the narcotics investigation had probable

20   cause to stop and search the vehicle for narcotics.  They argued, however, that the stop violated the

21   Fourth Amendment because Officer Hublen stopped the vehicle based on the erroneous belief that

22   the driver of the vehicle had violated the traffic statute.

23       In holding that the stop did not violate the Fourth Amendment, the court first rejected the

24   argument that the subjective purpose of the uniformed police officer's traffic stop rendered

25   irrelevant the issue of whether the officers had probable cause to stop and search the vehicle for

26   narcotics.  The court stated:

27       The Supreme Court had made clear that an officer's subjective
        thoughts play no role in the Fourth Amendment analysis.  *Whren v.*
28       *United States*, 517 U.S. 517 U.S. 806, 811-13, 116 S.Ct. 1769, 135

L.Ed.2d 89 (1996).  More specifically, the fact that officers acted on one rationale "would not foreclose the [government] from justifying the [search] by proving probable cause." *Florida v. Royer*, 460 U.S. 491, 507, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *United States v. Willis*, 431 F.3d 709, 71 (9th Cir. 2005) ("*Whren* stands for the proposition that if the officers have probable cause to believe that a traffic violation occurred, the officers may conduct a traffic stop even if the stop serves some other purpose.")  Thus, it does not matter whether Officer Hublen was directed to make a "traffic stop," nor does it matter whether he had valid grounds to make the traffic stop because of lane straddling.  If the officers had probable cause, then the seizure and search of the vehicle was justified.

*Ramirez*, 473 F.3d at 1030-31.

The court further held that the officers had probable cause to stop and search the vehicle based on the collective knowledge doctrine.  Under this doctrine, the court determines "whether an investigatory stop, search or arrest complied with the Fourth Amendment by 'look[ing] to the collective knowledge of all the officers involved in the criminal investigation although all of the information known to the law enforcement officers involved in the investigation is not communicated to the officer who actually [undertakes the challenged action].'" *Ramirez*, 473 F.3d at 1032.  The facts before the court "illustrate[ed] a second situation in which the collective knowledge doctrine applies: where an officer (or team of officers), with direct personal knowledge of *all* the facts necessary to give rise to reasonable suspicion or probable cause, directs or requests that another officer, not previously involved in the investigation, conduct a stop, search or arrest." *Id.*, at 1033.

The court rejected the defendants' argument that the doctrine should not apply when the officer directing the action fails to inform the officer who conducts the stop, search or arrest about its purpose.  The court stated:

But placing such a limitation on the collective knowledge doctrine would go far beyond the purpose of "distinguish[ing] officers functioning as a team from officers acting as independent actors who merely happen to be investigating the same subject."  (citation omitted).  Indeed, where one officer directs another to take some action, there is necessarily a "communication" between those officers, and they are necessarily functioning as a team.  Officer Hublen was not investigating Ramirez or Beltran independently; he acted only because of a communication from a fellow officer. *See Shareef*, 100 F.3d at 1503 n. 4 (noting that "[i]t is well-established that when an order to stop or arrest a suspect [is communicated to

11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

officers in the field, the underlying facts constituting probable cause or reasonable suspicion need not be communicated").

*Ramirez*, 473 F.3d at 1036.

In this case, Detective Rose, and the other detectives who assisted him in conducting the surveillance and apprehension of Defendant Centers on March 6, 2013, had probable cause to arrest him for possession of a firearm by a convicted felon.  Detective Nakhla, who was part of that team, requested Officer O'Halloran to conduct a traffic stop on the vehicle in which Defendant Centers was driving.  Accordingly, the stop of Defendant Center's automobile did not violate the Fourth Amendment.

### 2.     Whether the Search of the Automobile Violated the Fourth Amendment.

The Government asserts that the impoundment and inventory search of the automobile Defendant Centers was driving was justified under the "community caretaker function" exception to the Fourth Amendment's warrant requirement.  Defendant contends, however, that neither the impoundment nor the inventory search of the automobile was lawful.

In *South Dakota v. Opperman*, 428 U.S. 364, 369, 96 S.Ct. 3092, 3097 (1976), the Supreme Court held that as part of their community caretaking function, the police may, without a warrant, impound motor vehicles that "'jeopardize public safety and the efficient movement of vehicular traffic.'"  The police may also conduct an inventory search of the impounded vehicle for the purpose of protecting the owner's property while it remains in police custody, to protect the police against claims or disputes over lost or stolen property, and to protect the police from potential danger.  *Id.  See also United States v. Cervantes*, 703 F.3d at 1141, citing *Miranda v. City of Cornelius*, 429 F.3d 858, 864 (9th Cir. 2005).  "However, 'an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence.'"  *Cervantes*, 703 F.3d at 1141, quoting *Florida v. Wells*, 495 U.S. 1, 4, 110 S.Ct. 1632.  "[I]n order to ensure that the inventory search is 'limited in scope to the extent necessary to carry out the caretaking function,' it must be carried out in accordance with the standard procedures of the local police department."  *United States v. Wanless*, 882 F.2d 1459, 1463 (9th Cir. 1989).  *See also United States v. Maddox*, 614 F.3d 1046, 1049 (9th Cir. 2010) ("Vehicle inventory searches must be conducted 'in

1   accordance with the standard procedures of the Washington State Patrol' in order for the procured

2   evidence to be admitted in federal court").

3       Probable cause to believe that a driver has committed a traffic violation is not sufficient

4   justification by itself to make the impoundment of a vehicle reasonable under the Fourth

5   Amendment. *Cervantes*, 703 F.3d at 1141.  The reasonableness of the impoundment depends on

6   whether it fits within the "'authority of the police to seize and remove from the streets vehicles

7   impeding traffic or threatening public safety and convenience. . . .'"  *Id.*, quoting *Miranda v. City of*

8   *Cornelius*, 429 F.3d at 864.

9       In *Miranda v. City of Cornelius,* the court further stated as follows:

10          Whether an impoundment is warranted under this community
            caretaking doctrine depends on the location of the vehicle and the
11          police officers' duty to prevent it from creating a hazard to other
            drivers or being a target for vandalism or theft.  *See United States v.*
12          *Jensen*, 425 F.3d 698, 706 (9th Cir. 2005) ("Once the arrest was
            made, the doctrine allowed law enforcement officers to seize and
13          remove any vehicle which may impede traffic, threaten public safety,
            or be subject to vandalism."); *Hallstrom v. City of Garden City* , 991
14          F.2d 1473, 1477, n. 4 (9th Cir. 1993) (impoundment of arrestee's car
            from private parking lot to "protect the car from vandalism or theft"
15          was reasonable under community caretaker function). . . .

16      429 F.3d at 864, citing *Opperman*, 428 U.S. at 369.

17      In *Colorado v. Bertine*, 479 U.S. 367, 375-76, 107 S.Ct. 738, 743 (1987), the defendant

18   argued the impoundment of his vehicle was unconstitutional because police department regulations

19   "gave the police discretion to choose between impounding his van and parking and locking it in a

20   public parking place."  In rejecting this argument, the Court stated that "[n]othing in *Opperman* or

21   [*Illinois v. Lafayette*, 462 U.S. 640, 103 S.Ct. 2605 (1973)] prohibits the exercise of police

22   discretion so long as that discretion is exercised according to standard criteria and on the basis of

23   something other than suspicion of evidence of criminal activity."

24      In *Diomampo v. State*, 124, Nev. 414, 431-33, 185 P.3d 1031, 1042-43 (2008), the Nevada

25   Supreme Court upheld the impoundment and inventory search of a motor vehicle that was parked

26   in an unsecure location, obstructing traffic.  Neither the driver nor the passenger had valid driver's

27   licenses and neither person was the registered owner of the vehicle.  The police department

28   impound policy at issue did not require the police to contact the registered owner of the vehicle

1   prior to impounding it.  The Court therefore held that the officer's failure to notify the vehicle

2   owner prior to impounding the vehicle did not negate the validity of the inventory search.  In

3   contrast to the police policy at issue in *Diomampo,* Section 5/202.20 of the LVMPD policy manual

4   states that "[i]f the arrestee is not the registered owner, the officer will attempt to notify the

5   registered owner that the vehicle in question will be towed if they do not come to the scene and

6   take custody of their vehicle.  The registered owner would be advised they need to respond in a

7   timely manner (generally 30 minutes.)"  *Defendant's Exhibit C, pg. 476.*

8          Detective Rose testified that he and/or Sergeant Connell spoke by telephone to Ms. Gray,

9   who stated that she was unable come to the scene to retrieve her automobile and that she instead

10  requested that the vehicle be released to the passenger, Chaquaya Moore.  Detective Rose further

11  claimed that he inquired where Ms. Gray was located to see if the police could possibly pick her up,

12  but that Ms. Gray declined to reveal her location.

13         Detective Rose's testimony in this regard is not credible.  He initially testified that he spoke

14  with Ms. Gray on his cellular telephone.  When Defendant's counsel requested that his cellular

15  telephone records be produced, Detective Rose changed his story and testified that he and/or

16  Sergeant Connell spoke with Ms. Gray on Ms. Moore's cellular phone.  There was no independent

17  evidence to support Detective Rose's testimony regarding this communication.  Although Officer

18  O'Halloran and Detective Kinsler testified that they believe the registered owner of the vehicle was

19  contacted, neither had any personal knowledge of such a communication.  Detective Rose did not

20  document the factual circumstances relating to the impoundment of the vehicle in his Arrest Report

21  or in the Vehicle Impound Report as required by 5/204.06 of the LVMPD policy manual.  Sergeant

22  Connell, who could presumably verify Detective Rose's testimony if it is true, was not called to

23  testify at the hearing.  Finally, Detective Rose's demeanor as a witness was poor.

24         By contrast, Ms. Gray's testimony that she did not speak with the police about picking up

25  her automobile to avoid it being impounded is supported by her cellular telephone records and is

26  not contradicted by anything other than Detective Rose's questionable testimony.  Although Ms.

27  Gray clearly has a motive to testify in a manner favorable to Defendant's position, her demeanor as

28  a witness was generally believable.  The Court therefore accepts Ms. Gray's testimony over that of

                                                    14

1    Detective Rose.

2          Contrary to the Government's assertion during the November 13th hearing, Section

3    5/202.20 of the LVMPD policy manual does not simply require that the registered owner be

4    notified of the decision to impound the vehicle.  The section clearly is intended to require police

5    officers to attempt to contact the registered owner and afford him or her a reasonable opportunity to

6    retrieve the vehicle and avoid the impoundment.  Nor does the LVMPD policy demonstrate a

7    preference for impounding vehicles as the Government asserted in its response.  *See Response*

8    *(#24), pg. 8.*  Section 5/204.06 states that "[i]t is the policy of this department that to impound a

9    vehicle without cause is strictly forbidden."  The Government has not met its burden to show that

10   Detective Rose or the other police officers complied with the vehicle impound policy.

11   Accordingly, the impoundment of the automobile was not within the scope of the "community

12   caretaking function" exception to the Fourth Amendment and the police were not authorized to

13   perform an inventory search.

14         Defendant also argues that the handgun was not found during a properly conducted

15   inventory search.  The LVMPD policy manual states that "when a vehicle is lawfully impounded

16   (See 5/202.20 and 5/200.06), an officer shall conduct an inventory search of that vehicle and

17   containers found therein and report all personal property on the LVMPD 503, Vehicle Impound

18   Report."  *Defendant's Exhibit C, pg. 442.*  Given the purpose of an inventory search, the police may

19   not dismantle the vehicle, for example by removing the dashboard or door panels, in a search for

20   weapons or other contraband.  On the other hand, officers may open the glove compartment or

21   consul as part of an inventory search.  *South Dakota v. Opperman*, 428 U.S. at 375 n. 10, 96 S.Ct.

22   at 3100 n. 10.  Courts have also held that it is proper for the police to search concealed areas in the

23   engine compartment of a vehicle and open boxes located in the engine compartment as part of an

24   inventory search.  *United States v. Lumpkin*, 159 F.3d 983 (6th Cir. 1998); *United States v. Lewis*, 3

25   F.3d 252 (8th Cir. 1993); and *United States v. Pappas*, 452 F.3d 767, 772 (8th Cir. 2006).

26   Detective Rose testified that Detective Nakhla was able to retrieve the handgun from the vehicle by

27   reaching up into the area where it was located and pulling it out.  There was no evidence that the

28   officers had to remove any part of the dash or plastic cover to retrieve the handgun.  While there

may be some question whether Detective Kinsler could, in fact, see the trigger and trigger guard of the firearm through the gap in the dash or plastic covering, the Court cannot conclude that the handgun would not have been discovered during a properly conducted inventory search.

### 3   Whether Defendant's Statements to the Police Should be Suppressed as "Fruits of the Poisonous Tree."

Following Defendant Centers' arrest and the discovery of the handgun in the automobile, he was interviewed at the detention center by Detective Rose.  Prior to questioning, Detective Rose informed the Defendant of his *Miranda* rights.  *See Government's Response to Defendant's Motion to Suppress (#24), Exhibit 5, "Voluntary Statement."*  During this interview, Defendant Centers allegedly made statements admitting that he displayed a handgun at the Palms Hotel and Casino on January 13, 2013 and also admitting that the handgun found in the vehicle he was driving on March 6, 2013 belonged to him.   Defendant argues that his statements relating to both matters should be suppressed as the fruits of the poisonous tree.

 As stated in *United States v. Davis*, 332 F.3d 1163, 1170-71 (9th Cir. 2003), the standard articulated in *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407 (1963) remains the relevant test:

> [T]he "question in such a case is whether, granting establishment of the primary illegality, the evidence to which [the] instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id.* (internal quotation marks omitted).  There are three exceptions to this exclusionary rule: (1) the independent source exception;  (2) the inevitable discovery exception; and (3) the attenuated basis exception. *See United States v. Smith,* 155 F.3d 1051, 1060 (9th Cir. 1998).

The police in *Davis* suspected that the defendant, a convicted felon, was involved in a shooting incident that resulted in death.  The police conducted an illegal search of defendant's rented room during which they discovered a shotgun.  A few hours after the search, the defendant submitted to a voluntarily interview with the police during which he admitted that he had been in possession of the shotgun.  The defendant was subsequently indicted for possession of a firearm by a convicted felon.   The court found that the first two exceptions to the exclusionary rule were not applicable under the facts.  In regard to the third exception, the court stated:

16

1

2

3

4

5

6

 The facts also do not support a conclusion that the link between the search and Davis' statements is so attenuated as to dissipate the taint of the search's illegality.  All that Davis need show is that the seized shotgun "tend [ed] *significantly to direct* the investigation toward the specific evidence sought to be suppressed." *United States v. Smith,* 155 F.3d 1051, 1061 (9th Cir. 1998) (alteration in original) (quoting *United States v. Cales,* 493 F.2d 1215, 1216 (9th Cir. 1974)). Because Davis seeks to suppress testimonial evidence, the appropriate inquiry is whether Davis testified without coercion and whether the fruits of the search induced his testimony. *See id.* at 1062.

7

8

9

10

11

 At the time of the interview, a few hours after the search, Benedetti was aware that Davis was an ex-felon for whom possession of a firearm was a crime and that a shotgun had been found among Davis' belongings.  He questioned Davis about the gun and, in response, Davis admitted to owning the gun.  Under the circumstances, it cannot be doubted that the search of Davis' bag led directly to his incriminating statements.  Given the direct causal link between the search and the statements and the absence of any applicable exception, we conclude that the district court should have suppressed Davis' statements as fruit of the poisonous tree.

12

13

14

15

16

17

18

19

 In this case, Defendant Centers was arrested and taken to the detention center where Detective Rose interviewed him a little more than one hour after his vehicle had been stopped. During that interview, Detective Rose questioned Defendant about the handgun found during the search of the automobile.  As in *Davis*, it cannot be doubted that the search of Defendant's automobile led directly to his incriminating statements regarding possession of the handgun found in the automobile.  His statements relating to possession of that handgun should therefore be suppressed.

20

21

22

23

 Defendant also requests that the Court suppress Defendant's statements about the incident at the Palms.  The indictment in this case does not charge Defendant with a crime in relation to the incident at the Palms.  If and when Defendant is charged with an offense related to that incident, the court in that case should decide whether Defendant's statements are admissible.

## CONCLUSION

24

25

26

27

28

 The impoundment of the vehicle driven by Defendant was invalid because the Government has failed to demonstrate that the police officers followed the police department's written policy which required them to attempt to contact the registered owner of the vehicle and afford her a reasonable opportunity to retrieve the vehicle before it was impounded.  Because the impoundment

17

was invalid, the resulting inventory search of the automobile was unlawful.  The evidence relating to the discovery of the handgun should therefore be suppressed.  Defendant's subsequent statements to the police relating to his possession of that handgun should also be suppressed as "the fruits of the poisonous tree."  Accordingly,

## **RECOMMENDATION**

**IT IS RECOMMENDED** that Defendant's Motion to Suppress Physical Evidence and Statements Due to an Impermissible Search and Seizure (#22) be **granted**.

## **NOTICE**

Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within fourteen (14) days.  The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time.  *Thomas v. Arn*, 474 U.S. 140, 142 (1985).  This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court.  *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 19th day of November, 2013.

GEORGE FOLEY, JR.
United States Magistrate Judge

18